UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
BABATUNDE SHODUNKE,

Petitioner,

-against-

**MEMORANDUM & ORDER**

COUNTY OF QUEENS,

07-CV-329 (RJD)

Respondent.
---------------------------------------------------------------X
DEARIE, Chief Judge.

Petitioner Babatunde Shodunke, an unregistered alien from Nigeria, seeks a writ of habeas corpus pursuant to 28 U.S.C. §2254 challenging his 2002 conviction for heroin distribution and conspiracy. He received a sentence of fifteen years to life, later reduced under the Drug Law Reform Act to eight years plus five years post release supervision, and in September 2008 was deported.

The state's principal trial witness was the undercover officer who purchased fifty grams of heroin from petitioner and his codefendant Bola Adeola on October 2, 1998 and another 100 grams on October 16, 1998. According to the undercover officer, petitioner's role in these transactions was to pick up the officer at a designated location, inspect and count the cash that the officer brought, and drive the officer to a McDonald's in Far Rockaway, where petitioner would then telephone Adeola, who would appear shortly with the heroin. The deals were consummated in petitioner's car with petitioner functioning, quite literally, as middleman: the heroin and cash were exchanged between Adeola, who stood outside the car, and the undercover officer, seated inside the car, through petitioner's hands. Corroborating the testimony of the

undercover officer were wiretap and video surveillance tapes of portions of these events, the purchased heroin, and the testimony of a confidential informant who, already known to petitioner from prior drug sales, first introduced him to the undercover.

Petitioner and Adeola both testified, each claiming that what they sold the undercover was an herbal remedy to treat his grandmother's diabetes, not heroin. Petitioner also asserted, alternatively, that he participated in the transactions in question as agent of the undercover officer rather than in concert with Adeola.

Here on habeas, petitioner does not challenge the sufficiency of the evidence supporting his conviction, but claims that he did not receive a fair trial because the court denied his motion for a severance, refused his instruction on agency, and allowed the prosecutor to deliver an improper summation. He also claims he was denied a speedy trial because of alleged delays in the pre-trial appointment of Nigerian interpreters to assist the defense with portions of the audiotapes, and that his trial counsel was ineffective because he allegedly misadvised petitioner of the immigration consequences of a drug conviction. The petition also attacks many of the trial court's evidentiary rulings on state law grounds.

For the reasons set forth below, the application is denied and the petition dismissed.[1]

## DISCUSSION

### I. Controlling Habeas Standards

When a habeas petitioner's claim has been addressed on the merits by the state court, habeas relief is not available unless the state court decision is contrary to or an unreasonable

---

[1] Assuming the parties' familiarity with the sprawling record and lengthy briefing in this case, we set forth additional facts only as they are relevant to each section of our analysis.

application of clearly established federal law as determined by the holdings of Supreme Court decisions. See 28 U.S.C. § 2254(d); Carey v. Musladin, 549 U.S. 70, 74 (2006); Rosa v. McCray, 396 F.3d 210, 219-20 (2d Cir.), cert. denied, 546 U.S. 889 (2005). To prevail, a habeas petitioner must show that the state court's application of Supreme Court law "was not merely incorrect, but objectively unreasonable." Hemstreet v Greiner, 491 F.3d 84, 89 (2d Cir. 2007) (internal quotation marks omitted), cert. denied, 128 S.Ct. 962 (2008). See generally Bell v. Cone, 535 U.S. 685, 693 (2002) (Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law"); Brecht v. Abrahamson, 507 U.S. 619, 633-34 (1993) (even before AEDPA, habeas corpus was an "extraordinary" remedy, "designed to guard against extreme malfunctions in the state criminal justice systems," and "[t]hose few who are ultimately successful [in obtaining habeas relief] are persons whom society has grievously wronged . . . in light of modern concepts of justice") (internal quotation marks and citations omitted). Even if trial error of constitutional magnitude is shown, the writ may issue only if that error "had [a] substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637 (internal quotation marks and citation omitted). We apply the Brecht harmless error test "whether or not the state appellate court recognized the error and [whether or not it] reviewed [the error] for harmlessness." Fry v. Pliler, 551 U.S. 112, 121-22 (2007).

**II. Severance**

A. Pre-trial. Before trial, petitioner moved unsuccessfully for a severance from Adeola on the grounds of antagonistic defenses and disparity in proof. When affirming his conviction,

the Appellate Division concluded that "the trial court providently exercised its discretion in denying [petitioner's] application for a severance, and [that petitioner] failed to show that he was substantially prejudiced due to the joint trial with his codefendant." People v. Shodunke, 12 A.D.3d 466 (2d Dep't 2004), lv. app. denied, 4 N.Y.3d 767 (2005).

Joinder and severance of defendants are matters of state law ordinarily not cognizable on habeas. See Estelle v. McGuire, 502 U.S. 62, 68 (1991). "To set aside a state court conviction because of the denial of a severance motion, a federal court must conclude that the petitioner's right to a fair trial, as secured under the fourteenth amendment, was abridged." Grant v. Hoke, 921 F.2d 28, 31 (2d Cir. 1990) (internal quotation marks and citation omitted).

We share the state court's view that petitioner was not prejudiced by his joint trial, and find neither constitutional nor state law error in the court's denial of severance. The joinder of petitioner and Adeola was appropriate because both were charged with participating in a "common scheme or plan" and the proof against each was the same. N.Y. Crim. P. Law §200.40. Although New York trial courts have authority to sever when one defendant's "comparatively minor role" creates a "likelihood of prejudice to him," id., or when the "core" of one defense is "in irreconcilable conflict" with the other, People v. Mahboubian, 74 N.Y.2d 174, 183 (1989), the severance decision remains committed to the trial court's discretion. C.P.L. §200.40.

The events as they unfolded at trial dispel any notion that the court exercised its discretion improvidently, much less unconstitutionally, when denying the pre-trial motion for severance. The disparity in proof that petitioner predicted turned out to be evidence of differing but complementary roles in a single heroin conspiracy, and the supposed antagonism between

defenses never materialized, with both defendants relying on the identical herbal remedy claim. Further, petitioner's independent assertion of the alternative defense of agency did not create "irreconcilable conflict" with Adeola, Mahboudian, 74 N.Y.2d at 184, because agency was not petitioner's "core" defense. Grant, 921 F.2d at 32. In addition, as discussed in section IV, *infra*, the agency claim lacked any factual basis.

B. During Trial. Petitioner also claims that the court should have ordered a severance or mistrial after Adeola engaged in disruptive behavior on the stand. During his direct examination, Adeola began to "rant and rave" (as the trial court described the behavior) about pre-trial and sentencing matters; the court quickly interrupted him, removed the jury, and reprimanded Adeola, while petitioner moved for a mistrial. The court then instructed jurors to base their verdict on the evidence rather than the "pent up emotion and frustration" displayed by Adeola, and the direct examination of Adeola resumed. But Adeola quickly became disruptive again, the court again removed the jury, and petitioner renewed his motion for a mistrial. When Adeola's tirade continued, Adeola's counsel joined the mistrial application. Petitioner told the court he feared that Adeola could be overheard in the jury room, and moved a third time for a mistrial.

The court again reprimanded Adeola and then discussed the matter at length with both defense teams. Pursuant to the court's ensuing ruling, Adeola's counsel completed his planned direct examination of his client, after which Adeola continued to testify in a open-ended, unstructured narrative; this portion of Adeola's testimony fills seven transcript pages and covers a range of subjects, including God, the police and the case. In a special instruction about the "unusual way" Adeola was testifying, the court told jurors that it "trust[ed] their common sense

and judgement to extract the things that are not properly before [them] and to consider only the things that deal with the law and the facts pertaining to the charges." Petitioner's claim here specifically asserts that by allowing Adeola to testify in this manner, the trial court only made matters worse, and prejudiced petitioner by denying his request to deliver narrative testimony.

Under New York law, if grounds for a severance arise during the trial, the court has discretion to grant a mistrial. Plummer v. Rothwax, 63 N.Y.2d 243 (1984). Further, by statute, the trial court "must declare a mistrial" when, *inter alia*, "there occurs during the trial . . . conduct inside or outside the courtroom[] which is prejudicial to the defendant and deprives him of a fair trial." C.P.L. §280.10(1).

The state court's handling of the Adeola episode was not contrary to or an unreasonable application of Supreme Court fair trial jurisprudence.[2] As the Court has long recognized, "there can be no such thing as an error-free, perfect trial, and . . . the Constitution does not guarantee such a trial." United States v. Lane, 474 U.S. 438, 445 (1986) (internal quotation marks and citation omitted). The critical inquiry is not whether Adeola's outbursts were as severe as described or whether the trial court's handling of the matter was ideal, but only whether these events rendered petitioner's trial fundamentally unfair. We answer this question in the negative.

First, we are confident that the jury appreciated that the questions of petitioner's guilt and Adeola's trial demeanor were distinct. Although the trial court did not give a contemporaneous curative instruction on separateness at the time of Adeola's outbursts, the court's final charge

---

[2] This portion of petitioner's claim was rejected on the merits by the Appellate Division for purposes of deference under §2254(d), whether we regard it as included within the severance claim that the state court expressly denied or a distinct "mistrial" claim, which would place it among the "remaining claims" that the Appellate Division found to be "without merit." Shodunke, 12 A.D.3d at 466.

included a proper instruction on this subject, emphasizing that the cases "[a]s to each defendant . . . are separate entities" that "do not stand or fall together."

Second, petitioner was convicted by a jury that also observed *him* as *he* made his own claim of innocence on the stand, and even the court remarked that petitioner's demeanor was gentlemanlike throughout the trial. Adeola's outbursts, therefore, likely prejudiced only Adeola's interests, while petitioner likely benefitted by any comparisons the jury might draw.

Third, there was overwhelming evidence of petitioner's guilt, in the testimony of the undercover, the informant, the chemist, and the audio and video surveillance tapes, convincing us that petitioner would have been convicted even if tried separately. See Brecht, 507 U.S. at 637 (to warrant habeas relief, claimed trial error must have a "substantial and injurious effect or influence in determining the jury's verdict").

**III. Prosecutorial Misconduct**

A. Summation Remarks. Petitioner complains that, during summation, the prosecution (i) improperly vouched for its own witnesses by noting that the undercover "had been working the job for more than ten years" and "is in the United States Navy" and by stating that "the only evidence in front of you is the evidence put forth by the members of the New York City Police Department;" (ii) denigrated the defense by describing petitioner's testimony as that of "another interested witness;" (iii) argued that the undercover would not "risk his career not only with the Police Department but with the United States Navy for these guys" by planting the heroin; and (iv) treated the confidential informant as a de facto expert by positing, "who else would have information about drugs on the street other than a drug dealer? I mean, you almost have an expert there."

The Appellate Division rejected petitioner's prosecutorial misconduct claim as either unpreserved or without merit, Shodunke, 12 A.D.3d at 466, finding that the challenged remarks "constituted fair comment and a fair response to the defense counsel's summation." Id.

To state a constitutional claim based on prosecutorial misconduct, "it is not enough that the [challenged] prosecutor's remarks were undesirable or even universally condemned." Darden v. Wainwright, 477 U.S. 168, 180 (1986). Rather, constitutional error arises only when the challenged prosecutorial conduct is "egregious" or "so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). Accord Greer v. Miller, 483 U.S. 756, 765 (1987) (prosecutorial misconduct violates due process only when it is of "sufficient significance to result in the denial of the defendant's right to a fair trial").

On their face, the prosecutor's comments hardly rise to the level of improper conduct, much less constitutional error. The defense closings had likened the state's case to a staged "Broadway" production, asserted that the state's witnesses were "trained liars," claimed that the heroin was planted and the surveillance testimony manufactured, and described the state's evidence as "garbage" thirteen times. We readily conclude that the Appellate Division's determination that the prosecutor's remarks were a "fair response" to the defense summations is not contrary to or an unreasonable application of Donnelly, Darden, or Greer.

B. The Cross-Examination of Codefendant Adeola. Petitioner claims that the prosecutor engaged in improper cross-examination of codefendant Adeola by inquiring into a portion of Adeola's proffer statement that inculpated petitioner. Framing his claim as one of unfair surprise, petitioner points to the fact, undisputed here, that before trial (at the Sandoval

hearing), petitioner's counsel asked the prosecution whether there was "anything in [Adeola's proffer] that should be redacted regarding [his] client," and the prosecution represented that petitioner was not mentioned during the proffer meetings.

Petitioner did not object at trial and has not tendered cause for that omission or shown that a fundamental miscarriage of justice will result if the claim is not entertained. This branch of his prosecutorial misconduct claim, therefore, is barred from habeas review. See Coleman v. Thompson, 501 U.S. 722, 730-31, 750 (1991).

Were the claim properly before us, however, we would readily find it lacking in merit because the cross-examination claimed to be misconduct and an "unfair surprise" was an inquiry into a matter that Adeola had already testified to on direct, voluntarily and spontaneously. Specifically, Adeola testified that the police and district attorney coerced him into saying that petitioner was "a drug dealer" and that the product they sold the undercover was heroin. Adeola also vouched for petitioner, testifying that petitioner was not guilty of selling drugs and that petitioner was "not going to take no drug from [him]" or "for [him]" because he (petitioner) "kn[e]w better than that." was "a drug dealer." On cross-examination, the prosecutor merely sought confirmation of Adeola's direct by asking him, "even though you testified that you were forced to say things at the D.A.'s office, that is what you said?" and "they wrote down you should say [petitioner] was selling drugs with you?" Under the circumstances in which they were asked, these questions did not deny petitioner his constitutional right to a fair trial.

**IV. Agency Instruction**

After entertaining considerable legal argument on petitioner's request for an agency charge, the trial court concluded that, "at this time viewing the evidence in the light most

favorable to [petitioner], [it] d[id]n't see any reasonable view of the evidence that would support an agency charge," but stated that it would "let [the request] percolate a little further" and gave counsel the opportunity to be reheard and to provide additional caselaw. Counsel did not raise the matter again and did not argue agency in summation.

The Appellate Division determined that "the trial court properly denied petitioner's request for an agency charge" agreeing that, "[c]ontrary to [petitioner's] contention, there was no reasonable view of the evidence to support the theory that he was acting solely on behalf of the buyer in the drug transactions at issue." Shodunke, 12 A.D.3d at 466.

The Supreme Court has made clear that the burden on a collateral challenge to jury instructions is "even greater than the showing required to establish plain error on direct appeal." Henderson v. Kibbe, 431 U.S. 145, 155 (1977). A petitioner must show that "the ailing [absent] instruction by itself so infected the entire trial that the resulting conviction violates due process." Cupp v. Naughten, 414 U.S. 141, 147 (1973). When the claim, like petitioner's, is based on the failure to give a requested instruction, the burden is "especially heavy" because, "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Henderson, 431 U.S. at 155.

Petitioner cannot meet this substantial burden because he was not entitled under state law to the agency instruction. Under New York law, "one who acts *solely* as the agent of a purchaser of narcotics cannot be convicted of the crime of criminal sale of a controlled substance." People v. Roche, 45 N.Y.2d 78, 81, cert. denied, 439 U.S. 958 (1978) (emphasis added). Accord People v. Dobie, 249 A.D.2d 411, 412 (2d Dep't 1988) (agent is one who "act[s] as an instrumentality of the buyer *rather than as* a seller") (emphasis added). To be sure, a "trial court [is] required to

view the evidence in the light most favorable to the defendant and to give the instruction where there [is] 'some evidence, however slight, to support the inference that the supposed agent was acting, in effect, as an extension of the buyer.'" Dobie, 249 A.D.2d at 412 (quoting, People v. Arigbay, 45 N.Y.2d 45, 55 (1978)). But we agree with the state court that there was no reasonable view of the record that would support the theory that petitioner was acting solely on behalf of the undercover, or not at all in his own interests. Indeed, the question is not even as close as the trial court's willingness to revisit the matter would suggest. Petitioner points to the fact that he already knew the undercover, but there was not a scintilla of evidence to support the notion that petitioner was either an unwitting chauffeur or a collaborating undercover. Even if the charge arguably was warranted under the "some evidence, however slight" state-law standard, we cannot conclude that the absent instruction "by itself so infected the entire trial that the resulting conviction violates due process," Cupp, 414 U.S. at 147, or that the state court decision was otherwise contrary to or un unreasonable application of Cupp and Henderson.

**V. Speedy Trial**

Petitioner claims that he was denied his constitutional right to a speedy trial because it was not until 20 months after his arrest that the court appointed Nigerian interpreters to help defense counsel translate portions of the surveillance audiotapes. Petitioner claims this delay impaired his ability to challenge the tapes' admissibility and to prepare his defense. He further alleges that once the interpreters were appointed, they were "not paid expeditiously," further delaying his trial. Both the trial court and the Appellate Division rejected petitioner's effort to

dismiss the charges on speedy trial grounds.[3]

In our view, the claim is frivolous.

To be sure, petitioner's trial in May 2002 did not occur until almost three years after his arrest on July 12, 1999, but the constitutional question is not one of mere day-counting; rather, "[w]hether a criminal defendant's right to a speedy trial has been violated is circumstance-dependent and determined by the multi-factor balancing test established in" Barker v. Wingo, 407 U.S. 514 (1972), which "weighs 'the conduct of both the prosecution and the defendant' by evaluating several factors, 'some' of which include the '[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.'" United States v. Ray, 578 F.3d 184, 191 (2d Cir. 2009) (quoting Barker v. Wingo, 407 U.S. at 530). These factors "must be considered together with such other circumstances as may be relevant," and "have no talismanic qualities." Barker, 407 U.S. at 533. Rather, they require courts to "engage in a difficult and sensitive balancing process." Id.

Even under compelling facts it would be difficult to show that a state court unreasonably applied Barker because the test considers so many factors and is so circumstance-dependent. But the facts here undermine any intimation that petitioner's trial was unconstitutionally delayed. The record confirms that during the audibility hearing on the defense motion to suppress some of the audiotapes, held on December 6, 2000, the court granted the defense application for court-appointed Nigerian interpreters to assist with the tapes that were not in English. The colloquy on that motion also discloses that there had been some prior ruling, by a judge in another part,

[3] The Appellate Division rejected the claim silently, as one of petitioner's "remaining claims" found to be "without merit." Shodunke, 12 A.D.3d at 466.

denying an earlier request for interpreters. Nevertheless, although the appointment of interpreters occurred 20 months after petitioner's arrest, it is not the speedy trial culprit that petitioner has asserted.

Again, it is not our task to undertake a de novo Barker analysis, but merely to determine whether the state court's rejection of the speedy trial claim represents a "not merely incorrect, but objectively unreasonable" Barker outcome. Hemstreet, 491 F.3d at 89. In deciding that it is not, and that the extraordinary remedy of habeas is not warranted, we readily discern circumstances that could reasonably lead the state court to conclude that petitioner suffered no cognizable Barker prejudice. First, many of the taped conversations were in English and had been reviewed by counsel before he formally requested Nigerian interpreters at the audibility hearing. Second, petitioner himself understood the conversations in Nigerian, and to assist his efforts to study them, counsel purchased him a Walkman and arranged for ten tapes at a time to be furnished to him in his jail cell. Third, counsel reported to the court that he had had some access to private Nigerian translator services. Fourth, on the day petitioner formally requested interpreters he was also still weighing the state's latest plea offer. Fifth, when the defense moved at the close of the audibility hearing for the appointment of interpreters to assist in preparing for the ensuing minimalization hearing, the prosecution did not oppose the request. Finally, other than a conclusory assertion of impairment, petitioner has not identified specifically how his position at the hearings or at trial was hampered by the failure to assign state-funded interpreters at some earlier point in time.

## VI. Ineffective Assistance of Trial Counsel

Petitioner claims that his trial attorney was ineffective because he failed to inform

petitioner that he would be subject to deportation upon his conviction, insisting that had he known, he would have pled guilty instead of going to trial. Petitioner also claims that his attorney failed to apprise the court at re-sentencing of petitioner's impending deportation. Finally, petitioner assails as constitutional ineffectiveness essentially the entirety of counsel's representation, including his handling of jury selection, the wiretap evidence, petitioner's family's access to the courtroom, the examination of trial witnesses, and sentencing.

Petitioner did not raise this claim on appeal but did pursue it through a post-conviction motion to vacate pursuant to C.P.L. §440. The court denied the motion, concluding that the claim was procedurally barred under C.P.L. § 440.10(2)(c) because sufficient facts appeared on the record for petitioner to have raised the claim on appeal. People v. Shodunke, Ind. N10479/99, Decision and Order dated Aug. 3, 2006, at 2. The court also concluded that, in any event, petitioner had failed to demonstrate that counsel was ineffective. Id. at 2-3.[4]

As to the portion of petitioner's claim attacking counsel's trial preparation and performance, the court, "having presided over [petitioner's] trial," concluded that petitioner's allegations were "unsupported and speculative." Id. at 3. The trial court also rejected each strand of the immigration-related allegations, concluding that petitioner could not show he was prejudiced by whatever advice counsel gave or did not give because he had "not demonstrated that at the time trial commenced, there was a plea available to him that would have avoided deportation," or that "but for counsel's erroneous advice or lack thereof with regards to the possible immigration consequences of a conviction after trial, he would have pled guilty." Id. at

[4] The Appellate Division denied leave to appeal the trial court's denial of petitioner's 440 motion. People v. Shodunke, Dec. & Order, Dec. 13, 2006.

4. Documentation of petitioner's impending deportation, the court found, *was* furnished at re-sentencing, disposing of that branch of petitioner's claim, and under AEDPA, the court's decision explained, a sentencing court does not have any discretion to prevent the removal of an alien convicted of an aggravated felony. Id. at 5 (citing United States v. Couto, 311 F.3d 179 (2d Cir. 2002)).

Assuming without deciding that all strands of the ineffectiveness claim are properly before us, we readily conclude that the state court's rejection of the claim is not contrary to or an unreasonable application of Strickland v. Washington, 466 U.S. 668, 687-88 (1984). Under Strickland, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," 466 U.S. at 689, but here we hardly need to resort to presumptions to dispose of petitioner's claim. The 1,600-page trial transcript, along with the motion papers counsel prepared and the suppression hearings he conducted, adequately evidence zealous, competent representation. Thus, this portion of petitioner's claim fails the deficient performance prong of Strickland.

As for the deportation-related allegations, we likewise find no constitutional error, concluding that petitioner cannot make the showing of Strickland prejudice. To be sure, an attorney's advice about the immigration consequences of his client's conviction are words of great importance and can, if inaccurate or misleading, be deemed objectively unreasonable for ineffectiveness purposes. See, e.g., INS v. St. Cyr, 533 U.S. 289, 322 n. 48 (noting that "the American Bar Association's Standards for Criminal Justice provide that, if a defendant will face deportation as a result of a conviction, defense counsel 'should fully advise the defendant of these consequences'" (internal citation omitted); United States v. Couto, 311 F.3d 179, 183, 187

(2d Cir. 2002) ("an attorney's failure to inform a client of the deportation consequences of a guilty plea, without more, does not fall below an objective standard of reasonableness," whereas "an attorney's affirmative misrepresentations on the subject might well constitute ineffective assistance"), cert. denied, 544 U.S. 1034 (2005). Here, petitioner asserts that his attorney "told [him] that based on his asylum status immigration would not be an issue and that [he] should not be concerned." Pet'r 440 Motion at 6. The record contains no statement from petitioner's trial counsel and the 440 court's decision, as noted, makes no finding with respect to whether such was counsel's advice. We, likewise, have no basis for assessing petitioner's unsupported assertion or passing upon the "deficient performance" prong of the Strickland test.

We do, however, agree with the state court's determination that, even if counsel's performance was deficient, no resulting prejudice has been shown. To establish such prejudice, petitioner must show a "reasonable probability" that, but for the deficiency, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. But there is nothing in the record to suggest that, at the time petitioner elected to proceed to trial, there existed a plea offer that would have spared him deportation. The 440 court found that petitioner had not demonstrated the existence of such an offer, and respondent has affirmatively represented to this Court that no such offer was extant. Resp. Aff. & Mem. at 51-2. See Zhang v. United States, 543 F. Supp.2d 175, 184-85 (E.D.N.Y. 2008) (in converse situation, where 2255 petitioner claimed he relied on counsel's erroneous advice about risk of deportation when deciding to forego trial and enter guilty plea, Strickland prejudice not shown because there was "no evidence that [Zhang] would have chosen to proceed to trial").

## VII. Petitioner's Remaining Claims

Petitioner asserts that he was denied a fair trial by several of the trial court's evidentiary rulings, including: the court's rulings on audibility, the decision to allow transcripts to be furnished as an aid to the jury, the decision to admit an unsigned copy of the informant's cooperation agreement, and the decision to admit an unsigned copy of Adeola's proffer agreement. Each of the rulings, however, was discretionary and involves pure questions of state law not cognizable on habeas. See Estelle, 502 U.S. at 68. In any event, the record shows that the court's audibility rulings followed a hearing at which the issues were fully and fairly litigated; the transcripts were not admitted into evidence or sent into the jury room but used solely as an aid; and the court's adverse inference charge concerning missing original documents cured any prejudice.

## CONCLUSION

For the foregoing reasons, the application is denied and the petition is dismissed. Because petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability shall not issue. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith. Coppedge v. United States, 369 U.S. 438 (1962). The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: Brooklyn, New York
December 3, 2009

s/ Judge Raymond J. Dearie

RAYMOND J. DEARIE
United States District Judge